IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>    vs.<br><br>KAULANA ALO-KAONOHI,<br>LEVI AKI, JR.,<br><br>              Defendants. | CR. NO. 20-00136 JMS<br><br>ORDER GRANTING IN PART AND DENYING IN PART GOVERNMENT'S DAUBERT MOTION TO EXCLUDE EXPERT TESTIMONY, ECF NO. 147 |

## ORDER GRANTING IN PART AND DENYING IN PART GOVERNMENT'S DAUBERT MOTION TO EXCLUDE EXPERT TESTIMONY, ECF NO. 147

## I.  INTRODUCTION

The government moves to exclude the testimony of Dr. Katrina-Ann K. Oliveira, who Defendant Levi Aki, Jr., ("Defendant") intends to call as an expert witness regarding Native Hawaiian language, culture, and geography.  ECF No. 147.  The government brings its Motion pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert I*"), and the related strictures of Federal Rule of Evidence 702.  ECF No. 147.  The government filed its Motion after receiving a written report authored by Dr. Oliveira, which has been filed in this case as ECF No. 189-1.

Native Hawaiian culture and geography are pertinent to this case because the crime charged in the indictment—a racially motived assault—was allegedly committed by Defendant and his Co-Defendant[1] in Kahakuloa Village, a mostly Native Hawaiian community in a rural region of west Maui.  *See* ECF No. 1; ECF No. 64 (PageID.439).  As a rebuttal to the government's racial-assault allegations, a theory of Defendant is that the alleged victim's ("C.K.'s")[2] behavior while visiting Kahakuloa Village was uniquely offensive to the members of that Native Hawaiian community, providing a non-racial motivation for the alleged assault that is colored by Native Hawaiian culture and geography.  *See* ECF No. 189 (PageID.1263–74).  The Native Hawaiian language ('ōlelo Hawai'i) is pertinent to this case because the evidence through which the government intends to establish racial animus includes an audio-video recording of the alleged assault and a police-interview transcript where Defendant uses two different phrases containing the word "haole" when referring to C.K. (hereinafter, the "'haole' remarks").[3]  The term "haole" originated in the Native Hawaiian language but has

---

[1] As of the date of this Order, Co-Defendant Kaulana Alo-Kaonohi has taken no official position on the government's Motion or on Dr. Oliveira's testimony.

[2] C.K. is a white "Caucasian" male.  In connection with a prior motion, ECF No. 64, the parties discussed how C.K. was visiting Kahakuloa from Arizona for the purposes of inspecting and improving a property he had purportedly purchased in the village in 2013, sight unseen.

[3] The first "haole" remark is Defendant stating to C.K., "[y]ou's a haole, eh?  You supposed to have fucking brains, eh?"  ECF No. 64-2 at 08:35.  The second "haole" remark is

(*continued . . .* )

been adapted to the modern vernacular of the English-speaking residents of Hawaii.

After Defendant filed his Opposition to the Motion, ECF No. 189, the court held a hearing on August 26, 2022.  *See* ECF No. 190.  During that hearing, the court directed Defendant to submit a proffer of evidence demonstrating his ties to Kahakuloa Village and, specifically, how long he had been a member of that community.  *See id.*  Defendant has done so.  *See* ECF No. 195.  The court also directed Defendant and the government to submit a stipulation laying out the area(s) of agreement with respect to Dr. Oliveira's testimony.  *See* ECF No. 190. The parties have done so.  *See* ECF No. 196.

For the reasons provided below, the court GRANTS in part and DENIES in part the government's Motion.

## II.  <u>STANDARD OF REVIEW</u>

Federal Rule of Evidence 702 governs testimony by expert witnesses:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

Defendant stating to a detective, "[C.K. is] saying that I whacked him with a shovel? . . . Typical haole."  ECF No. 60-2 (PageID.396).

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The court must act as a gatekeeper to prevent unreliable expert testimony from reaching the jury. *Daubert I*, 509 U.S. at 589. In carrying out that obligation, the court has discretion and flexibility in determining what evidence is relevant, reliable, and helpful to the trier of fact. *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1420 (9th Cir. 1998); *United States v. Rincon*, 28 F.3d 921, 926 (9th Cir. 1994) ("District courts must strike the appropriate balance between admitting reliable, helpful expert testimony and excluding misleading or confusing testimony to achieve the flexible approach outlined in *Daubert* [*I*]."). The gatekeeping obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citing Fed. R. Evid. 702)).

A preliminary gatekeeping step is determining whether the proposed expert is sufficiently qualified by "knowledge, skill, experience, training, or education" to render an expert opinion. *See* Fed. R. Evid. 702. That is, "the trial court is required to determine whether a proposed expert is qualified to give expert testimony" "in the relevant field." *Whisnant v. United States*, 2006 WL 2927732,

at *2 (W.D. Wash. Oct. 11, 2006) (citing *Kumho Tire*, 526 U.S. at 156). The qualification standard in Rule 702 "is broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). But "[a] person qualified to give an opinion on one subject is not necessarily qualified to opine on others." *Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1431 (9th Cir. 1991).

As for substantive gatekeeping, courts in the Ninth Circuit conduct a two-pronged analysis when admitting specific testimony from an expert witness. *See Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*"). The first prong is that the proffered testimony must be reliable. *Id.* The reliability inquiry focuses on the expert's "principles and methodology, not on the conclusions that they generate." *Daubert I*, 509 U.S. at 595. The reliability inquiry is flexible; although *Daubert I* lists factors for the reliability inquiry, courts have discretion to determine whether those factors are reasonable measures of reliability in a particular case. *Kumho Tire*, 526 U.S. at 152–53. The *Daubert I* factors are not reasonable measures of reliability in a case—such as this one— where the proposed expert testimony is not "scientific expert evidence" but is instead "heavily [dependent] on the knowledge and experience of the expert, rather than the methodology or theory behind it." *United States v. Hankey*, 203 F.3d 1160, 1167–69 (9th Cir. 2000) (reciting and declining to apply the *Daubert I*

factors, e.g., "the known or potential error rate of the theory or technique"); *see also United States v. Hall*, 974 F. Supp. 1198, 1200 (C.D. Ill. 1997) ("[F]or example, a mechanic can testify about his practical knowledge of carburetors without requiring his conclusions to be deduced from the scientific method.").

When assessing the reliability of expert testimony grounded in specialized, non-scientific knowledge—such as testimony on languages or on the social or behavioral aspects of different communities—courts probe the expert's "real-world experience rather than [his/her] experimentation." *See, e.g.*, *Hall*, 974 F. Supp. at 1202. "Such experiences might be personal or vicarious." *Id.* "There must be a threshold number of experiences from which the expert's knowledge is drawn." *Id.*; *see also Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1006 (9th Cir.), *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001) (finding proposed expert testimony on Korean business culture unreliable because the expert made "sweeping generalizations, derived from his limited experience and knowledge [concerning Korean businesses]—plainly a skewed sample"). "[T]hose experiences must be sufficiently similar in nature to form a valid basis for comparison." *Hall*, 974 F. Supp. at 1202; *see also United States v. Smith*, 919 F.3d 825, 836 (4th Cir. 2019) ("[Language] experts do not translate based on any one piece of information or learned treatise (like a dictionary) but analyze and synthesize an array of information learned over years.").

The second prong of admissibility is the "fit" requirement, i.e., that expert testimony "logically advances a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315.  The focus of the "fit" inquiry is "primarily [on] relevance." *Daubert I*, 509 U.S. at 591.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (citation omitted).

But the "fit" requirement is not merely a reiteration of the relevancy standards in Federal Rules of Evidence 401–403.  Because "[e]xpert evidence can be both powerful and quite misleading [given] the difficulty in evaluating it," "the judge in weighing possible prejudice against probative force under Rule 403 of the [Federal Rules of Evidence] exercises more control over experts than over lay witnesses." *Id.* at 595 (citation omitted).  Courts must therefore exclude proffered expert testimony pursuant to Rules 702 and 403 unless they are convinced that the testimony speaks clearly and directly to a disputed issue and that it will not mislead the jury. *Daubert II*, 43 F.3d at 1321 n.17 (discussing scientific expert evidence, specifically).  And to be admissible, "the subject matter [of the testimony] at issue must be beyond the common knowledge of the average layman." *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002); *United States v. Hanna*, 293 F.3d 1080, 1086 (9th Cir. 2002); *see also United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996) ("Because the fields of psychology and psychiatry deal with human

7

behavior and mental disorders, it may be more difficult at times to distinguish between testimony that reflects genuine expertise—a reliable body of genuine specialized knowledge—and something that is nothing more than fancy phrases for common sense.").

## III.  DISCUSSION

Defendant's proposed expert witness, Dr. Oliveira, is expected to testify on the topics of Native Hawaiian language, culture, and geography. Regarding the first topic, Dr. Oliveira is expected to testify more specifically about the term "haole."  After reviewing the government's challenges, the court will permit all of that proposed testimony, with the exception—as explained below—of Dr. Oliveira's opinion that the contemporary use of "haole" cannot possibly "carr[y] an offensive or derogatory connotation," ECF No. 189-1 (PageID.1285). Regarding the latter two topics, the court will permit Dr. Oliveira's testimony but with the caveat that Dr. Oliveira's opinions on the submitted video evidence may lack probative value depending on whether there is evidence connecting Defendant to C.K.'s conduct in those videos.

### A.    Dr. Oliveira's Testimony Regarding Native Hawaiian Language and the Term "Haole"

On the topic of Native Hawaiian language, Dr. Oliveira expects to testify as to (1) her interpretations of the "haole" remarks; (2) the origins of the term "haole," framed within a discussion of ʻōlelo Hawaiʻi; and (3) the term's

development into its contemporary usage in the community of Kahakuloa.  ECF No. 189-1 (PageID.1284–86, 1290–91).  Her principal opinions on the "haole" remarks—which she interprets as benign descriptions of the "outsider" or "foreign" C.K., not as racially derogatory epithets—naturally rebut the government's position that the remarks evince a racial motivation behind the alleged assault.  *See* ECF No. 129 (PageID.939).

The court first holds that Dr. Oliveira is qualified to testify as an expert on the Native Hawaiian language and the pertinent subtopics contained therein.  She has adequate knowledge, experience, training, and education on that topic.  *See* ECF No. 189-2 (PageID.1294–1297) (Dr. Oliveira's curriculum vitae listing, among many other qualifications, her Bachelor of Arts in Hawaiian Language and her Associate and Full Professorships at the University of Hawaiʻi at Mānoa's Kawaihuelani Center for Hawaiian Language); ECF No. 189-1 (PageID.1278–79) (summarizing Dr. Oliveira's relevant experience, training, and education).

### 1.    *Interpretations of the "haole" remarks*

Dr. Oliveira is permitted to testify as to her interpretations of the "haole" remarks made by Defendant.  The methodology Dr. Oliveira employs in arriving at those interpretations is reasonable and reliable.  It consists of evaluating the circumstances in which those remarks occurred, accounting for the surrounding

dialogue, and considering both the speaker and the recipient(s).  Her methodology is informed by her experiences with the Native Hawaiian language and Kahakuloa Village, experiences that are personal, sufficiently similar, and sufficient in number.  *See* ECF No. 189-1 (PageID.1278) ("I focused my scholarship on Kahakuloa because I am a lineal descendant of some of the earliest native Hawaiian settlors to the area. . . .  My report below is based on my extensive research on, and personal experience with, various ancestral places of Hawaiʻi, and specifically, Kahakuloa."); *id.* ("In 1985, the University of Hawaiʻi at Mānoa began conferring to qualified graduates a Bachelor of Arts Degree in Hawaiian Language.  I graduated and received my B.A. in Hawaiian Language 11 years later. Therefore, there are not many people who have engaged in formal Hawaiian Language scholarship longer than I have.  In 1999, I began teaching extensively in the areas of Hawaiian Language, Hawaiian Culture, and Geography.").

To be sure, Dr. Oliveira cannot testify as to whether Defendant subjectively harbored racial animus when he uttered "haole."  *See* Fed. R. Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.").  Dr. Oliveira is not an expert in reading Defendant's mind and thus cannot reliably testify as to Defendant's mental state, i.e., his subjective intent when uttering "haole."  *See*

*United States v. Eye*, 2008 WL 11391363, at *2 (W.D. Mo. Apr. 23, 2008)

("[D]ivining an individual's motivations is probably beyond the ken of any field of

expertise.").

        Dr. Oliveira can, however, analyze the objective evidence—the

history and contemporary development of the term "haole," along with the identity

of the speaker, including his cultural background, the identity of the recipient, and

the fuller context of the statements—and interpret the "haole" remarks based on

that objective evidence.  *See United States v. Williams*, 81 F.3d 1434, 1442 (7th

Cir. 1996) ("A linguist or professional code-breaker might testify to the *probable*

*meaning* of [a gang's] code words." (emphasis added)).  Although this may seem

like splitting hairs, it is what the law requires of an expert witness.  *See United*

*States v. Watson*, 260 F.3d 301, 308–09 (3d Cir. 2001)[4]; *United States v. Mason*,

Case No. 3:13-cr-00298 (D. Or.), ECF No. 126 ("Thus, even if the Court allows

Dr. Eggington to be called to testify concerning the varying meanings of certain

words, . . . Dr. Eggington will not be allowed to express any opinion to the jury

---

[4] In *Watson*, the Third Circuit described a "fine line that expert witnesses may not cross": "Expert testimony is admissible if it merely supports an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony. . . .  It is only as to the last step in the inferential process—a conclusion as to the defendant's mental state—that Rule 704(b) commands the expert to be silent."  260 F.3d at 308–09 (alternations, citations, and internal quotation marks omitted) (citing various courts of appeals' opinions, including *United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997)).

concerning what Defendant Mason may have thought or intended, or not thought or not intended, when Defendant Mason uttered certain words.").

For the "fit" inquiry, Dr. Oliveira's interpretations advance a material aspect of the defense—as discussed above, those interpretations naturally rebut the government's position that the "haole" remarks demonstrate racial animus, a crucial element of the government's case. The court finds that Dr. Oliveira's interpretations will not mislead the jury. The court also finds that her interpretations concern an issue beyond the common knowledge of the average juror—understanding a term from the relatively unfamiliar language of ʻōlelo Hawaiʻi[5] when uttered by a Native Hawaiian in a predominately Native Hawaiian community, albeit amid sentences composed of English words. In that respect, this case is closer to the cases requiring expert testimony to interpret conversations held in a language that is foreign to the average lay juror, *see, e.g.*, *United States v. Pangelinan*, 2020 WL 4785430, at \*2–3 (D. Kan. Aug. 18, 2020), than to cases not permitting expert testimony to construe a term that is ambiguous, possibly

---

[5] The Native Hawaiian language is "unfamiliar" in the sense that many jurors serving in the District of Hawaii do not speak the Native Hawaiian language beyond understanding the occasional words that have been adapted into modern English, e.g., "aloha" or "mahalo." *Cf. In re Ross*, 8 Haw. 478, 480 (1892) ("We are aware that, though the Hawaiian language is the original language of this people and country, the English language is largely in use."); ECF No. 189-1 (PageID. 1284) (Dr. Oliveira describing how ʻōlelo Hawaiʻi was the sole language spoke in the islands in 1778, but how English and Hawaiʻi Creole English, i.e., Pidgin, became more prevalent as foreign business interests grew and when ōlelo Hawaiʻi was banned in Hawaii classrooms in 1896).

pejorative, but nonetheless well within the vocabulary of the average lay juror, *see, e.g.*, *United States v. Eye*, No. 05-cr-00344-SRB (W.D. Mo.), ECF Nos. 407, 411 (government requesting exclusion of expert's opinion that the use of "negro," among other terms, was not racially derogatory, and the court granting that request in part because "the proposed testimony [would] not 'assist the trier of fact to understand the evidence' as required by Rule 702").

> **2.** **Origins of the term "haole," framed with a discussion of the Native Hawaiian language**

Similarly, Dr. Oliveira's testimony on the origins of "haole," framed with an overview of the Native Hawaiian language, passes the "fit" requirement. That testimony concerns an issue beyond the common knowledge of the average juror, and it informs Dr. Oliveira's ultimate interpretations of the "haole" remarks, interpretations relevant to a crucial element of this case.

Regarding reliability, Dr. Oliveira's testimony on the origins of the term "haole" leverages her experiences with the Native Hawaiian language. Those experiences are both personal and vicarious. *See* ECF No. 189-2 (PageID.1294–97, 1298–305) (Dr. Oliveira's curriculum vitae listing professorships, faculty positions, and research papers related to the Native Hawaiian language). And those experiences are sufficiently similar and numerous. *See id.*; ECF No. 189-1 (PageID.1278).

The court thus will permit Dr. Oliveira to testify on the origins of "haole."  But such testimony will be limited to provide context for Dr. Oliveira's interpretations of the "haole" remarks.  Such testimony should, therefore, be limited in both scope and duration, lest it mislead the jury.

### 3. *Development of the term "haole" into its contemporary usage in Kahakuloa Village*

The court also will permit Dr. Oliveira to testify on the development of the term "haole" into its contemporary usage among members of Kahakuloa Village.  *See* ECF No. 196 (PageID.1346) (Defendant and the government stipulating to permit such testimony).  Dr. Oliveira's testimony on that subtopic is reliable.  It leverages her personal and vicarious experience with the Native Hawaiian language and that language's relationship with the prevailing English language, of which Dr. Oliveira is also knowledgeable.  *See* ECF No. 189-1 (PageID.1285) (Dr. Oliveira discussing the intricacies of translating ʻōlelo Hawaiʻi to English); ECF No. 189-2 (PageID.1305–06) (Dr. Oliveira's curriculum vitae listing courses taught, including "HAW 401 Fourth-Level Hawaiian," which involved "[t]ranslating English into Hawaiian, and Hawaiian into English").  It also leverages her experience with and knowledge of the language practices of Kahakuloa Village.  *See* ECF No. 189-1 (PageID.1284) ("Due to their isolation, remote Hawaiian villages tend to have fared better than cities like Honolulu in retaining the use of ʻōlelo Hawaiʻi. . . .  In Kahakuloa, families continue to use

14

many ʻōlelo Hawaiʻi words and sentence structures in their normal conversations.").  The court finds Dr. Oliveira's experiences to be sufficiently similar in nature and sufficient in number.  Further, her testimony regarding the contemporary usage of "haole" in Kahakuloa Village passes the "fit" test because it informs her interpretations of the "haole" remarks, interpretations relevant to a crucial element of this case.

The court will not, however, permit Dr. Oliveira to testify that "haole" can never be offensive or derogatory regardless of the context or the speaker, *see* ECF No. 189-1 (PageID.1285).  That testimony goes beyond Dr. Oliveira's areas of expertise—the Native Hawaiian language and its relationship with the English language, particularly within Kahakuloa Village—and into the diverse cultural and language practices of the citizens of the Hawaii.  That testimony is, therefore, unreliable.  Defendant's counsel admitted as much during the August 26, 2022 hearing by conceding that "haole," when used by the average citizen of Honolulu, can be racially derogatory depending on the context.  *See also* ECF No. 189 (PageID.1274) (Defendant arguing in his Opposition that "[e]ven by American English modern vernacular standards, the word 'haole' is only sometimes regarded as a derogatory epithet" (citing *Yoshikawa v. Seguirant*, 41 F.4th 1109, 1112 n.2 (9th Cir. 2022)); *Yoshikawa*, 41 F.4th at 1112 n.2 ("The word 'haole' means 'foreigner' in Hawaiian.  In the modern vernacular 'haole' typically refers to

15

Caucasians or others who are not 'locals.'  It is sometimes regarded as a derogatory epithet.").

In sum, the court will permit Dr. Oliveira to testify on the term "haole," except that she cannot testify that "haole" is never racially derogatory under any circumstance.  The court thus denies in part and grants in part the government's Motion with respect to the topic of Native Hawaiian language and the pertinent subtopics contained therein.

## B.    Dr. Oliveira's Testimony Regarding Native Hawaiian Culture and Geography, and the Offensiveness of C.K.'s Actions

On the topics of Native Hawaiian culture and geography, Defendant seeks to offer Dr. Oliveira's testimony as to how Kahakuloa is a place where Native Hawaiian cultural practices are still perpetuated, how the culture of the community of Kahakuloa is unique, and thus how C.K.'s behavior was uniquely insulting to that community.  *See* ECF No. 189-1 (PageID.1280–84).  That testimony includes a sketch of the history of the "'āina"—Hawaiian "land," "that which feeds"—and how the people of Kahakuloa Village have personal relationships with the 'āina, i.e., how "Hawaiians' familial relationship to the 'āina informs the understanding and relationship of the Kahakuloa community with the land."  *Id.* at PageID.1280.  Ultimately, Dr. Oliveira intends to fold such testimony into her principal opinion that, given the unique cultural practices of the Kahakuloa Village, C.K.'s "trespassing" was uniquely offensive to the members of that

16

village, including Defendant.  *See* ECF No. 189-4 (summarizing proposed expert testimony); *see also* ECF No. 189-1 (PageID.1286–1290).  Dr. Oliveira's principal opinion naturally rebuts the government's position that the alleged assault was committed because of C.K.'s race or color.

The court holds that Dr. Oliveira is qualified to testify as an expert on Native Hawaiian culture and geography, particularly with an eye towards Kahakuloa Village.  She has adequate knowledge, experience, training, and education on those topics.  *See, e.g.,* ECF No. 189-2 (PageID.1298) (Dr. Oliveira's curriculum vitae listing, among other publications, her book titled "Ancestral places: Understanding Kanaka geographies"); *id.* (PageID.1305–06) (listing, among other courses taught, "GEOG 368 Geography of Hawai'i" and "HAW 373 Ka Moʻomeheu Hawaiʻi," "a survey course on the study of traditional Hawaiian culture including origins, the socioeconomic system, land tenure, religion, values, and the arts"); ECF No. 189-1 (PageID.1278–79) (summarizing relevant experience, training, and education).

For similar reasons, Dr. Oliveira's testimony regarding Native Hawaiian culture and geography is reliable.  She has both personal and vicarious experiences with those topics.  *See* ECF No. 189-1 (PageID.1278) ("In 1999, I wrote my master's thesis, 'Ohu'ohu 'o Kahakuloa Ku'u Kulāiwi' (The Mists of Kahakuloa, My Beloved Ancestral Land) about the history, traditions, and place

names of Kahakuloa.  As such, I have extensive knowledge of ancestral places in Hawai'i, especially Kahakuloa.  I focused my scholarship on Kahakuloa because I am a lineal descendant of some of the earliest native Hawaiian settlors to the area.").  And her experiences are sufficiently similar and are sufficient in number. *See id.*; ECF No. 189-2 (curriculum vitae demonstrating significant, meaningful experiences with Native Hawaiian culture and geography).

Dr. Oliveira's testimony regarding Native Hawaiian culture and geography is also a good fit for this case.  It is not misleading and, as discussed above, it informs her principal opinion that C.K.'s behavior in Kahakuloa Village was uniquely offensive to the members of that village, an opinion that tends to rebut the government's assertion that the alleged assault was motived by racial animus.  Likewise, Dr. Oliveira's principal opinion is helpful to the average juror, is not misleading, and was formed according to sound methodology.  Dr. Oliveira incorporated her extensive knowledge of Kahakuloa Village culture into an assessment of how C.K.'s actions—both separately and as a whole—could offend or even threaten a member of that village.  Bottom line:  Dr. Oliveira's opinion regarding the offensiveness of C.K.'s behavior *from the perspective of the members of Kahakuloa Village* is reliable and is a good fit for this case.  The court thus will permit Dr. Oliveira to testify on Native Hawaiian culture and geography,

and to provide her ultimate opinion regarding how C.K.'s behavior was uniquely offensive.[6]

That permission is qualified, however, with the caveat that such testimony must be given with an eye towards Kahakuloa Village and the alleged actions of Defendant.  Although the court is not currently sustaining the government's objection to Dr. Oliveira's discussing "historical wrongs against Kahakuloa residents," including "'Hawaiian displacement from land' by outside interests," ECF No. 147 (PageID.1009), the government may renew that objection if Dr. Oliveira's testimony wanders too far into "historical wrongs." *See United States v. Melton*, 2008 WL 5381931, at \*4 (S.D. Miss. Dec. 19, 2008) ("While Defendants will be allowed to establish that they were aware of prior illegal activity at this property, they will not be permitted to catalog specific instances. Such evidence would not be relevant to their intent on the night in question.  Even if that historical evidence offered some limited probative value, such value is

---

[6] The parties have stipulated that "Dr. Oliveira may provide the following pertinent contextual information about Kahakuloa village: its size, location, remoteness, and geographic layout; its lack of mail delivery, county water access, and cellphone service; its subsistence lifestyle, including communal farming and fishing practices; and its sense of communitarianism." ECF No. 196 (PageID.1346–47).

substantially outweighed by the risk of unfair prejudice and confusion." (citing Fed. R. Evid. 403)).[7]

The government also objects on the ground that "whether behavior is insulting or disrespectful is not 'scientific, technical, or other specialized knowledge' that is beyond the ken of a lay juror," ECF No. 147 (PageID.1012). But that argument minimizes the undeniably distinct cultural practices of Kahakuloa Village,[8] elements that, in the court's estimation, will not be appreciated by the average lay juror without the aid of expert testimony, and that support a defense theory that Defendant is entitled to present under the Due Process Clause, *see Washington v. Texas*, 388 U.S. 14, 18–19 (1967) ("The [due process] right to offer the testimony of witnesses . . . is in plain terms the right to present a defense [and] the right to present the defendant's version of the facts . . . .").

---

[7] The court does not address the government's request to revisit the prior ruling excluding the government's evidence of "hostile conduct by several Kahakuloa residents" towards other attempted home buyers, *see* ECF Nos. 65 and 111. The government argues that such evidence should be admitted now because Defendant is "opening the door" by having Dr. Oliveira testify regarding historical wrongs. ECF No. 147 (PageID.1009–12). But because Dr. Oliveira has not yet testified, the court cannot evaluate the specifics of her testimony or, more importantly, the defense's narrative under which the testimony is introduced. The government's request is thus premature.

[8] The government seems to admit that some cultural practices are unique given its stipulation that Dr. Oliveira can testify on, among other things, Kahakuloa's "remoteness," "lack of mail delivery," and "subsistence lifestyle," ECF No. 196 (PageID.1346–47).

In support of her opinion, Dr. Oliveira is expected to testify regarding the contents of six audio-video recordings to flesh out the specifics of how C.K. offended the Kahakuloa community.  Because the court has inspected those videos ahead of trial and can compare them with Dr. Oliveira's written report, the court provides parameters on Dr. Oliveira's expected testimony regarding the videos.

Two of the videos—"Video 1009" and "Video 1026," ECF Nos. 189-3A and 189-3D, respectively—were the subjects of the government's prior "Motion to Admit Intrinsic Evidence," ECF No. 64, which the court generally granted, *see* ECF No. 111.  Those two videos feature conversations between C.K. and apparent members of Kahakuloa Village regarding, among other things, C.K.'s cutting a chain lock on the entrance gate to Kahakuloa Village so that he could access a property he purportedly purchased.  Assuming Dr. Oliveira's trial testimony on the two videos is consistent with the contents of her report, *see* ECF No. 189-1 (PageID.1286–87, 1289), the court would find such testimony reliable. But there are issues with the "fit" of that testimony, or even with the traditional balancing test under Federal Rule of Evidence 403, if there is no evidence linking Defendant to the conversations in the two videos.  Put differently, even if C.K.'s actions and words in Videos 1009 and 1026 were uniquely offensive to members of Kahakuloa Village as Dr. Oliveira opines, Defendant would need to have been aware of those actions and words for Dr. Oliveira's opinion to advance the

defense's theory that the alleged assault was motivated by C.K.'s disrespectful behavior.

Likewise, Dr. Oliveira's opinion of "Video 1027," ECF No. 189-1 (PageID.1289–90) (referencing ECF No. 189-3G), could lack fit and sufficient probative value if there is no evidence demonstrating that Defendant was aware that C.K. "le[ft] beer as a bribe to get the Kuleana residents to embrace [him]," *id.* Aside from the Heineken beer, Video 1027 features dialogue between C.K. and his companions, dialogue that does not appear to have been heard by anyone other than C.K. and his companions and thus, absent contrary evidence, would not advance the defense's theory.

Dr. Oliveira's opinion of "Video 1025" may suffer from similar defects regarding whether its relevancy is substantially outweighed by the dangers of prejudice or misleading the jury.  True enough, that video shows C.K. cutting the lock on the entrance gate—an action Defendant was certainly aware of, *see* ECF No. 64-2 at 00:33—but it also contains dialogue between C.K. and his companions that does not appear to have been heard by anyone else.  Absent evidence to the contrary, Dr. Oliveira's opinion on that dialogue would not, therefore, advance the defense's theory.

"Videos 1021 & 1023" fare no better.  As for those videos, Dr. Oliveira opines in her report that C.K.'s blocking Kahekili Highway with his car

22

came off as "rude, selfish, and arrogant" to the community members, and that

C.K.'s "walking down the private road with [his] video cameras rolling" alongside

the surveyor was "[a]nother potentially offensive action."  ECF No. 189-1

(PageID.1287).  Again, however, Defendant needs evidence that he was aware of

those offensive actions in order for Dr. Oliveira's opinions on those actions to

advance the defense's theory.  The same can be said of Dr. Oliveira's opinion of

C.K.'s stating to the surveyor that he planned to play frisbee with his son on

community-owned land, and of Dr. Oliveira's opinion of the surveyor's telling

C.K. that he could "actually write an easement that [says] you're the only guy that

has access to come [down the neighboring beach path]."  *Id.* (PageID.1288).

   In sum, the court will permit Dr. Oliveira to testify on Native

Hawaiian culture and geography and as to how C.K.'s behavior was uniquely

offensive to the community of Kahakuloa.  But as explained above, that permission

is qualified by the requirement that Defendant introduce evidence demonstrating

that he was aware of particular offensive actions in order for Dr. Oliveira to opine

on those actions.[9]

---

[9] This Order sets forth the court's strong inclination that Dr. Oliveira would not be permitted to testify concerning C.K.'s actions of which Defendant was not aware.  But the court also recognizes that neither party has been given the opportunity to brief whether such evidence would be admissible under Federal Rules of Evidence 403 through 405.  Although the court is of the preliminary view that Rules 403 through 405 would not permit such testimony, the court would certainly entertain an argument otherwise based on those rules and related case law.

## IV.  <u>CONCLUSION</u>

The government's *Daubert* Motion to Exclude Expert Testimony,

ECF No. 147, is GRANTED in part and DENIED in part.  Specifically, the Motion

is denied on the government's request to preclude the bulk of Dr. Oliveira's

testimony concerning Native Hawaiian language, but granted on its request to

preclude the specific testimony that the contemporary use of "haole" can never

carry an offensive or derogatory connotation.  Further, the Motion is denied on its

request to preclude Dr. Oliveira's testimony concerning Native Hawaiian culture

and geography, with the court's noted inclination that there must be evidence at

trial connecting Defendant to the actions that Dr. Oliveira identifies as offensive.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 17, 2022.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*United States v. Alo-Kaonohi et al.*, Cr. No. 20-00136 JMS, Order Granting in Part and Denying
in Part Government's Daubert Motion to Exclude Expert Testimony, ECF No. 147